May it please the Court, I'm Mark Kendall from Izzard Noble LLP, representing the plaintiffs Alessandra Balser and Ruth Krecha. This case was brought as a class action against the defendant on behalf of consumers who bought a series of products, body washes, lotions, and hair care products that were labeled as natural, even though they contained numerous synthetic ingredients. The district court dismissed the case, saying that no reasonable consumer could believe that just because the products were labeled natural, they didn't contain synthetic ingredients. The court also found, incorrectly, that the plaintiffs had failed to meet their pleading burden under Rule 9. And finally, in a prior set of rulings, the court effectively denied the plaintiffs the opportunity to conduct any sort of pre-class certification discovery, first by refusing to waive the local rule that class certification motions be filed within 90 days, despite the fact that the parties had stipulated to it. And second, after that ruling, when the plaintiff came back and asked to be allowed to conduct immediate discovery, not having to wait for the Rule 28 conference, the court effectively made that argument moot by pushing off argument on it until after the class certification motion was due. As it turned out, it didn't matter to what he decided. So where does that leave us now, if we have to deal with the motion to dismiss? Correct. And if we were to reverse on that, do you get another shot at the discovery? We do not, Your Honor. I'm sorry, yes. In the event that you reversed the motion to dismiss, then yes, we're back where we were before. But the problem is that as a result of the sequence of events here, we actually filed a motion for class certification on deadline as required, but had not been able to do class certification discovery. As a result, the motion did not have elements in it, did not have factual support, that we would very much like to have been able to have. We had to meet the deadline. Did you ever tell Judge Reill specifically what it was you wanted the discovery on? Yes, we did, Your Honor. When we filed our motion requesting expedited discovery, we explained why we wanted it for class certification, and we in fact attached a copy of our request. It's never actually ruled in that motion, is that right? That is correct. Theoretically, it's still open. So how are we deciding it? Well, at this point, the problem is that the whole motion became moot, A, because we've had a Rule 28. So therefore, we don't know. He might go back and he might grant it if we were to reverse. But the problem is we've already filed the class cert motion. I understand that. Correct. We want to be able to actually pull back that initial motion for class certification, do the necessary discovery, and file a more complete one as we would in a normal course. But I still don't see how we ruin it when there was no ruling on it by the district court. Well, I think that the overall point, Your Honor, that we've made in our briefs is that, you know, in the first instance, the court refused to allow us a waiver from the 90-day rule. Now, the subsequent ruling made it more difficult for us, because we were trying to get some sort of discovery. But the reality is that that very first ruling killed us, because by virtue of the pace of getting discovery and the fact that you have to wait until after, or you had to wait under the order of the district court, the court refused to allow us a waiver from the 90-day rule. And so we had to wait under the old rules until after having the Rule 28 conference. There's really no effective way to obtain discovery prior to 90 days after the filing of the complaint. Did the defendant ever respond to the motion? The defendant opposed the motion for immediate discovery. After having entered into the stipulation, the defendant had a change of heart. Well, no. I think the defendant was quite willing to say, yeah, I'm willing to put off this question of class certification, but I'm not willing to give you discovery a minute before you're entitled to it. That's a different question. All right. Do you want to talk about the motion to dismiss? So, okay, getting back to that, really we've got two effective questions here that the district court ruled on that I think are clearly in error. The first is this question of whether or not the plaintiff's complaint should have been dismissed because somehow reasonable consumers couldn't possibly have found that just because the product was labeled natural. What do we have, by the way? We have the complaint, which has some pictures. Correct. Do we have, and then there's a lot of discussion about the entirety of the labels. Do we have the entirety of the labels and the records somewhere? I believe you only have the initial, the complaint that has the pictures. And the pictures just have the front. Correct. And you have a... So what's all the rest of it about? There are descriptions of the portions that the parties consider relevant in both in the complaint and then also in their briefs. But presumably anything that's not in the complaint is irrelevant. You would think so. You would think so. I agree with that. So in the complaint, and, you know, frankly, in particular, this case revolves around the very front label where you have the word natural and a nice little green leaf and it's all there in pretty colors. The court said, look, everybody agrees that natural is a vague and confusing term. I don't know where the court got the idea that the plaintiffs agreed that natural was a vague and confusing term. We never stipulated to that. The complaint says in four different places, you know, natural in this context means that, you know, a reasonable consumer would think that natural in this context means that the product didn't contain any synthetic or artificial ingredients. We say that in four different places. And when we say natural, we say, okay, what we're talking about when we're talking about natural ingredients, what's a natural ingredient? Well, natural is something that's not artificial, it's not synthetic, it comes from nature. And we give the Merriam-Webster dictionary definition. Does that mean it's a plant? I mean, I don't think it has some sort of definable meaning, but on the other hand, everything ultimately, even all the things in these big chemicals ultimately come from nature, right? Well, right, and I think that the sort of common sense distinction that's drawn by Merriam-Webster, frankly, and, you know, by the cases is, well, is it synthetic or is it natural? Synthetic, in other words, is something that's made in a lab. Like a Twinkie, you would say, if Hostess had all natural Twinkies and it was the same ingredients that we're all familiar with, you would think that would not be an accurate description of the ingredients in Twinkies. I suspect it would not be an accurate description. You know, I would have to do the research. And here's the interesting thing, is that, you know, you really, looking at the back label isn't going to help you unless you're a chemist. You know, chemicals can be natural, water is a chemical. On the other hand, natural chemical, and natural chemicals can have really scary Greek-sounding names. There's a case out of the District of Connecticut, Langen versus Johnson & Johnson. We cited it in, we brought it to the court's attention as supplemental authority, where the court says, you know, look, even a blueberry, if you look at the, if you Google the ingredients, the ingredients of a blueberry, the ingredients sound scary. So you can't tell just by looking at the ingredient list whether something is a natural ingredient or is in fact a synthetic chemical. We did the research, and there are lots and lots and lots of synthetic chemicals in these products. So however it is you really want to define natural, you know, a natural ingredient, it's very clear that these products' ingredients aren't natural. And in fact, the defendant isn't arguing, well, you know, all of these ingredients are natural. He's saying, no, no, no, that doesn't matter. The only thing that matters is that there are some ingredients in the product that are natural. And I think that that's clearly wrong. I think that that's wrong on the basis of Williams as well. The Williams versus Gerber products case where this court in fact was dealing with a natural representation. One of the three representations that were at issue in the Gerber case, one of them was, you know, fruit and other all-natural ingredients. And the court said, well, no, a reasonable consumer might believe that that means that all of the ingredients in the product are in fact natural, that that's a reasonable thing. And it was interesting because one of the other representations at issue in Williams involved whether or not the products were nutritious. And the court in a footnote said, you know, that if it were that on its own, we might say this was puffery. But because, you know, the totality of what's going on here, we're not going to give them the benefit of the doubt. There was no question that the natural representation wasn't puffery. It wasn't so vague and ambiguous as to have no meaning. Boy, off the top of my head, I don't know. I expect that ethanol does exist in nature. I don't know. Maybe that's wrong. I don't know, Your Honor, but I do know that a lot of the ingredients in these products are not. And the point is that, you know, a reasonable consumer looking at this is going to see the natural representation. It's going to say, oh, okay, I like natural stuff. That's a big industry. That's over $100 billion industry on natural. And so a lot of companies are out there saying, how can we grab consumers? How can we get them to buy our product? How can we differentiate ourselves? I know. Let's convince them that it's natural. But they're not doing their homework and they're deceiving people. This is not a least sophisticated consumer standard, right? It's just the reasonable consumer. Absolutely. Absolutely. But, you know, a reasonable consumer that's out there looking for natural products isn't out there looking for a product that's got a drop of natural ingredients and a sea of chemical, of synthetic chemicals. They want something that's natural. And that's what they think this means. Absolutely. Absolutely. They are. And there are a lot of consumers. But I think that when you look at the standards. They're all part of that reasonable group. But I think that the, you know, there are certain statutes where you actually do look at the least sophisticated consumer. When you look at the reasonable consumer, that's not the frame that you. That's correct. Well, rule nine governs fraud, and it certainly should govern some of the elements of the complaint. But this court has laid out exactly what elements those are. It did it very nicely fairly recently in the, I think it's the U.S. case that we cite. And it says, you know, look, we've got the. Which is, oh yeah, CAFASO U.S. versus General Dynamics. It's cited in our brief. The complaint does every single one of those things. Who is the defendant? What is the products? Where? It says where the products were sold that are the subject of the complaint. When, with respect to the plaintiffs, it tells you where and when they bought them. How? We say that they market the products as natural. We say, you know, exactly how they market the products as natural, the specific representations. We say what's false, the natural statements. We say why it's false is because the products contain synthetic ingredients. Go back to the beginning again. Given all that and given that you have additional facts in your motion to certify the class, what difference does the discovery make? The discovery really, I'll tell you. Yes. The problem really is that as a result of a couple of the more recent Supreme Court decisions, there's this question out there, if you've got a damages claim, of whether at the class certification stage you have to be able to establish a model for getting damages on behalf of the class as a whole. I have this little chart and it says how much it purports to show the add-on for each product of what people were paying extra. And, you know, Your Honor, if a court would simply say that's all you need, I'd be delighted. Some courts have said that. Other courts have said you have to present a model and you have to show that it kind of works. Other courts still have said you not only have to present... But you bought the product and they paid so much extra because it was natural and so you multiply it and that's the model. Indeed. But you have to be able to say how much of the premium that was paid for the product related to the natural representation versus any other representations that were made. It does get a little complicated. And some courts have really held plaintiffs to a very high standard of how much has to be in that initial filing. We can't afford to gamble that the district court is going to be one of those that doesn't. Okay. You're close to out of time. I'll give you a minute. Good afternoon, Your Honors. James Scherz, Morrison & Forster, on behalf of Appelli, the Haines Celestial Group. Perhaps I can start by addressing two of the questions that were posed to my colleague. First, Judge Berzin, you posed the question, what do we know about the labels here? And what do we know with respect to the representations that are at issue? You'll find those in the First Amendment complaint. And it's important here because there are specific allegations that go to the back panel as well as the front panel. And those allegations provide a context that's meaningful in terms of how we understand this. Second, Judge Owens, you posed the question whether the reasonable consumer may be the least sophisticated consumer. And the answer to that has been consistently found in California law, that the reasonable consumer is not the least sophisticated consumer. And I would refer the Court to Hill v. Roll, 195 Calap 4th, 1295, which is discussed in our brief at page 12. It's very clear that the reasonable customer, consumer standard, does not encompass the unwary consumer, nor does it address the least sophisticated consumer. With that, Mr. Kendall and I agree with respect to the questions that are before this Court. And specifically the issue that this Court, that the trial Court realized was essential to its ruling, which is, is there an objective definition of natural in this case that would allow a plausible basis for the plaintiffs to state a claim? And based upon the definition that they have proposed in paragraph 1, footnote 1 of this amended complaint, the answer is clearly no. And when one looks in the context, the broader context, which is appropriate in this case, to see how Haines Celestial, the Alba Botanica line, provided a meaning and defined what natural meant in the context of a shampoo or a sunscreen. Actually, what you did was you said it doesn't, on the package, I guess, you said it doesn't include a couple things, right, in terms of the definition. I mean, you said natural, and then you said something about vegetarian, and then in summary you said it doesn't include X and Y. I forget what X and Y were. And then on the website you said it doesn't include X, Y, Z, and Q, a longer list. But that suggests to me that, you know, so then there are two ways to understand that. One is to say, but it includes a lot of things just like this that you wouldn't like anymore, or to say that these are the only synthetic, non-natural things it doesn't. In other words, it seems to assume by saying it doesn't include these things that there is some meaning in the word natural, and it's not things like this. So I refer the Court to paragraph 14, which is the back panel in the First Amendment complaint. And it's relevant here, Judge Burson, because in that, in the back panel, it provides a context of what is the meaning of natural. And as the back panel states, it's packed with botanical emollients, and then it identifies aloe vera, green tea, chamomile extracts. And then it goes further to say it is these cellular renewal is supported with alpha-hydroxy acids. So extremely rough, dry skin, et cetera. Alpha-hydroxy acids are a class of chemical compounds. There is no effort in this case to suggest that all of the ingredients in a shampoo are in fact botanical-based. Quite the contrary. The point here, and what the label shows on its face, and what the district court judge found below, is that Alba Botanica went out of its way to actively define what natural means. And that's further reinforced by paragraph 15 of the First Amendment complaint, which indicates we make natural 100% vegetarian personal care products. And then it continues. This means we don't use parabens, sulfates, and phthalates. So on the face of the back panel, in the context of the explanatory language that's on the front panel, and importantly the ingredient list, all of those things point to and provide a context for understanding how do we understand the term natural in the context of these cosmetic products, which under the Code of Federal Regulations are identified as chemicals, manufactured, complex chemical mixtures. So in this case, what the plaintiff has relied on is to turn to the first paragraph and say, well... it doesn't have any milk with fat in it, it has some olive oil. And that would be okay. So under Williams, Your Honor, if the ingredient list is being used to contradict an affirmative representation, a defendant cannot look to the ingredient list as a shield for liability. That's not the case here. The ingredient list is consistent with all of the representations that are made on the front and the back panel, and it's entirely consistent... Well, as defined by Alba Botanica in this context, it means the presence that it contains plant-based products. And one can look to, again, in the context of the paragraph 15 of the first amended complaint, where it states, our products contain natural, organic, and cruelty-free ingredient alternatives. It doesn't suggest that all... What were you reading from now? Oh, I see. On the website? On the website, cited by the plaintiffs here. Which are 100 percent vegetarian. The difficulty, and Your Honor pointed to this question earlier in your question about ethanol. Ascorbic acid is the perfect example here. Ascorbic acid is a synthetic form of vitamin C. It's used in a huge number of products. It is found in nature. It is invariably almost always used in a synthetic form when it's used in products. And it's the very issue that these plaintiffs have said constitutes a synthetic ingredient that must be found to be unnatural. There's nothing unnatural about vitamin C. And the alternative definition that they're supporting today, a definition that is not in the allegations, and in fact one of the difficulties that the district court had below, is that there is no specific allegation in this complaint as to what these plaintiffs believe natural is. What is their understanding? And that's why this complaint failed for purposes of Rule 9B. So in this context then, what we're left with is the dictionary definition that existing... It seems in fact that you don't disagree about what's natural and what isn't natural. You disagree about whether it has to be all of it or some of it. Well, I think in this context, Your Honor, the FDA has not defined in the cosmetics arena what constitutes natural. I'm sorry? Because it says it's contextual. It is, yes. Okay, but that doesn't mean it doesn't exist in an individual instance. It's just contextual. Correct. And it's subject to individual understanding and a case-by-case determination, which we see in the food context with FDA's informal guidance when they indicate that natural shall mean those things that...and includes artificial ingredients that are normally expected to be there. So again, even in the food context, we see a subjective element that's being introduced. So here in this context then, what the district court was faced with was an issue of natural. In the absence of any allegations as to what these individual plaintiffs believed... This is like Alice in Wonderland. The word means whatever you say it means. Is that basically what you're saying? No. No. It must be understanding context and it must be understanding... Well, suppose...now, they haven't done this, but suppose they amended the complaint and they looked at ten different shampoos that called themselves natural, and they showed that nine of them had one kind of ingredient, vegetarian...essentially vegetarian-based, and the ears was different. Would that matter? As a matter...so let's take this hypothetical. In other words, if they were able to demonstrate that in the context of shampoo, natural is understood even by the manufacturers to mean something particular. There has never been an allegation that there is a shelf-stable shampoo anywhere on the market, ever. That there is not a shampoo anywhere on the market that is made and composed of entirely 100 percent natural ingredients. It doesn't exist. Shampoos are made of surfactants and emollients and exfoliants and a range of products that by their nature work to dissolve oil and to clean. They include foaming agents and a wide variety of issues. My shampoo doesn't foam. I don't have much qualification. But I do have a question for you to get back to a question Judge Berzon asked, which I think is important for me. I was just looking out here on the countertop and we have these Arrowhead bottles, and it says 100 percent mountain spring water. If it just said mountain spring water, not 100 percent mountain spring water, and in fact it was 50 percent mountain spring water, 50 percent Flint water, is there, is that okay, because it doesn't say 100 percent? That's not a case that's before you. That's why it's a hypothetical. So it strikes me, it strikes me, Judge Davis, that there is... Maybe we're sitting in the wrong spot. I apologize. We talked about this before. We got in the wrong spot. I apologize. That's my mistake. The inclusion of the reference to 100 percent is a quantitative representation. So yes, it does make a difference. Because when one uses the language 100 percent naturally sourced... Well, then you're being absolutely clear about it. But does that mean that people are not entitled, when you say mountain spring water, to think that's what they're getting, as opposed to half mountain spring water? Like if it didn't say 100 percent on there, it just says mountain spring water. I think in that context, with a reasonable consumer faced with buying a bottle of water represented in that case, would a reasonable consumer believe reasonably that that water was 100 percent and that there was no mixing? I think that survives a motion to dismiss. That's not this case. Now, let's take the example... So I think what Judge Owens is getting at, and this is what I would like to get at you, is your basic contention that we know what natural means, but we don't know that there was no representation that it's 100 percent it, or even mostly it, or is it that natural doesn't have any ascertainable meaning in this context, or both? So, point one, natural is subject to understanding within its context and circumstances. Point two, in this context, where do we find the meaning? We find it in the context of the front label and the back label that are quoted and included in the First Amendment complaint. And why doesn't Williams tell us we don't look at the back label? Williams doesn't tell us that. Williams stands for the proposition that ingredient lists, the FDA mandated ingredient list, cannot be used as a shield to liability as a means of contradicting representations that appear on the principal display panel or the back label. Fair enough. That's not our issue. We embrace Williams. Williams is supportive of our view, and consistent with the way a range of district courts have analyzed this question following Williams in dismissing cases like this one, where you have contextual statements that provide meaning to the term natural, or provide meaning to representations that are made on a label. And in that context, it's entirely appropriate for us to look to, and in fact, it is meaningful for the Court to look to the ingredient list as part of the whole context of understanding a term. That was this Court's reasoning in Freeman v. Time, and it's similarly been found in a range of district court cases that include Palio. And the ingredient list serves some purpose, but it doesn't require an ingredient list so that manufacturers can mislead customers and then rely on the ingredient list. So I don't understand quite what the difference is between that and this situation. I know there were other things wrong with the label in Williams, but they specifically said that there was a problem with using the word natural and that the ingredient list didn't help. Let's back up. Williams involved fruit, juice, snacks. I know. I know. I know. I have read all of this. I am not asking you stupid questions, okay? It also involved the word natural, and the part that I just read you deals with the word natural. So in the context of which they found five separate elements that, in together, collectively represented affirmative misrepresentations, this Court decided that it was improper for a defendant to seek to use the ingredient list as a shield, that it could not use the ingredient list to create contradictions within representations that were made. That's not the case here. There has been no affirmative misrepresentation. Just in general, my zeitgeist impression is that the case laws all over the law, that there are cases saying what you say, there are cases saying what he says, and that there's no, I mean, that Williams is the closest in case in the Ninth Circuit, but in general, the cases are all over the law. Is that a fair characterization? And you pick one set and he'd pick another set. There are two cases, there are two decisions by this Court, Freeman v. Time and Williams v. Gerber. Following this Court's decision in Williams, you see two lines of cases. There are a group of cases that are predominantly coming out of the Northern District of California and involve food, in which the Court has found that the holding in Williams limits the ability to prevail on a motion to dismiss without leave to amend. You have a second line of cases that includes cases from the Central District as well as a case from the Northern District as recent as November of this last year, which we provided you. So you have two lines of cases. One takes the limiting language of Williams and expands upon it and suggests that one can only look at the principal display panel. Another line of cases, which includes Hairston and Palaio and the Ward Law v. Plum matter, and this case, suggest there's a broader context in which, to the extent that the plaintiff and defendant can identify cases that end up on their side. In other words, you could have answered my question, yes. There are two lines of cases, Your Honor. There are two lines of cases. How about outside the circuit? The case law is not as well developed outside of the circuit, and both the plaintiff and defendant can identify cases that end up on their side. I think I don't need to discuss with this Court the standard of review for changing or overturning a district court's decision with respect to the local rules. But it does seem that the timing, in light of the recent developments in class action law, is entirely unrealistic, as you seem to recognize by entering into the stipulation to begin with. I think the issue, and I'm speculating here as to what the district court was looking at, but what happened here is that the complaint was filed. And there had not been the requisite time period for making a CLRA damages claim. And so there was an amended complaint. Do you happen to know whether Judge Rios ever granted such a motion? Is this a pattern? I don't know. I don't know, Your Honor. And to your question, the matter has not been decided by the district court below. And so from a question of whether it's ripe for this Court to review. There's a ruling on the motion. There's a sort of functional ruling, but no actual ruling. We agree. That question, having rendered it moot, that would then go back to the Court. Thank you very much. Very briefly, on the question of context, Your Honor. If I were to put on our website for our firm, we're ethical people. That means we don't lie. That wouldn't suggest to a reasonable consumer that we don't lie is the only way in which we are ethical people. In other words, there's nothing about the substatement, we don't lie, that gives you context for the broader statement, we're ethical people. Similarly, in this case, on the front panel, the defendants say, natural, big green leaf. On the back panel, they say, let me tell you something about our products. We have this. We don't have that. But nothing in there says or even implies. And we also have a bunch of synthetic ingredients. It's on the label. It's on the back label. So, you know, there's an interesting case out of the Northern District of California, Sersen v. Diamond Foods, which is cited in our briefs last year, from 2014, where they have, it's a case where they have another label representation and it says, our natural promise on the back. And it says, we do this and we don't do that. And the defendant made a very similar argument. And Judge Armstrong, in reviewing it, said, I understand where you're coming from, but there's nothing in this that actually gives a limiting context to the broader thing that's being challenged here. I can't find, as a matter of law, that this creates a limiting definition. And I think that that's the answer here. The vegetarian statement, do you allege anything you complain about it other than its existence? You say something about what natural means. Do you say anything about what vegetarian means? Yeah, we include a dictionary definition of that, too. All right. Thank you very much.
judges: Berzon, Owens, Davis